The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and the Honorable Court. Josh Kendrick Mr. Kendrick.    The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Good morning. Josh Kendrick May it please the Court. My name is Josh Kendrick. I represent Bryan Marshall on appeal who has two claims of error from below. The first is a Fourth Amendment issue. The second is an Armed Career Criminal Act issue from his sentencing. Each of those two issues is governed by two questions. The search issue is governed by the answer to what extent can a citizen protest police action and what power do the police have to tow a vehicle from private property. The Armed Career Criminal Act is two familiar questions. Are the statutes at issue divisible? And if they are, how do we look at them and what shepherd documents exist? Turning to the search issue first, what we have here is a situation classic in our judicial precedent that a person is approached by the police, questioned by the police, refuses to cooperate with the police, and then becomes boisterous, becomes loud. All the words district court used in finding the facts that led to Mr. Marshall's arrest for disorderly conduct have been used before in the case law to say that that arrest was not proper, that he was well within his rights to curse at the officer, to refuse to answer questions, and to become loud and boisterous. If you look at the words that are used... Excuse me for just one second, Mr. Kendrick. What about the crowd that had gathered? How does that factor into your analysis? Well, if you look at it, Your Honor, the record is pretty clear where the crowd was, and that's purposeful because I knew where they needed to be. So I asked the officer, where are they? They're 10 to 15 yards away. They never get any closer than that. But more importantly, they never pose a specific threat to the police officer. When I asked him, what is it about this crowd that had you worried, his answer was, something could have popped off at any minute. Why? Because that's what I thought. So if we look at Terminillo v. City of... So you don't think that police officers, and we should acknowledge, they have some experience dealing with crowds and keeping crowds from turning into something more serious. We just ignore that in your view? Absolutely not, Your Honor. Okay. But... So didn't he recredit what he said? He didn't say anything. Yes, he did. He said he was concerned something could happen based on his experience. So we do... And you just said that too. So we do what with that? Do we ignore it or credit it? We ignore it unless he says why. Because his... He said why. But why? Where is the experience? What is it about this crowd that concerns you? And the Supreme Court tells us what he was allowed to be concerned about, clear and present danger of a substantive evil, a substantive danger. So experience... There was an indication that the person being arrested, your client, thought that the crowd was supportive of him and would help him in causing something to delay or interfere with the police action, correct? Absolutely, Your Honor. Classic protest. That is correct. And he threw the keys to the crowd. Absolutely. Right. And so we make nothing of that. We don't from a standpoint of whether he had probable cause to arrest him, Your Honor. But not because I say it, but because that's what the Supreme Court... No, no, no, no.  concerned about the crowd? I'm just... This is factual right now. Right. You said there was nothing. And I said he made the judgment that there was, and I said, do you credit that? And you went, no, not unless he says something. Well, he said something in the record. The record reflects what was going on and what he was thinking then. And I just pointed out to you one thing that was an objective fact was that the crowd was supportive in the effort to maybe cause a problem in the situation. You may say that's not enough, but I don't say you say factually that didn't exist. Well, so let's look at what it means and let's look at what it means from Supreme Court precedent. So Terminillo v. City of Chicago is a case where we have a riotous crowd. And if you look in the dissent of that case, which is where the losing sides argument is usually recited, Justice Jackson goes through the facts on the scene in Terminillo. It was riotous. It was thousands of people. It was violent. There were windows being broken, doors being broken down. It was extremely dangerous. And Terminillo gives a speech which brings that crowd even more, more riotous. And it's interesting because it's a 1949 case, so the words he used that the court is kind of shocked about are things like a slimy guy. So not the language we're used to today. But what the court is saying is that what's happening. Not the language like your client was using. Well, Your Honor, absolutely. You're right. My client was using bad language. But again. Same language used in the 60s against the President of the United States, cases like that. Absolutely. I mean, in the draft case, that's exactly what they used and the Supreme Court said it was okay. So I think what we can't do is parse out each of these facts. We look at it as a whole to see what are they doing. And the courts just simply address this. In Houston v. Hill, we have a similar situation where a guy is protesting police action and the fact. And you think the police were required to do what in this circumstance? To turn away and walk away from the circumstance? What do you think they were required to do by the law? Take us back to that night. Tell us what you think the police not could have done, maybe should have done, but were required to do by the law. Well, Your Honor, and I'll give you my answer, but it comes straight from Supreme Court. That's who I asked. Well, it's going to come straight from Supreme Court case law, which says they go home. And the reason they go home is because I asked him, did you have reasonable suspicion? So your point is, in this situation, when it occurs, when the police are concerned about a shooting that has happened, firing of a weapon, I don't know if anybody was hit, and they go to the scene and the truck looks like it could be involved and they get there. And if you could get two or three people to sort of shout at the police they shouldn't do it, your view is, under the law, the police then have to leave the scene. We left out what the most critical part of this is, Your Honor, which I asked the officer. It's about the relationship between him and Mr. Marshall. I know that, but you have to answer my question. Right. And the answer to your question is yes, Your Honor, under the facts in this case. Not under the facts that I just gave you. Right. But under those facts, you don't have reasonable suspicion and you don't have probable cause of anything that allows you to do anything other. No, no, no. I was talking about what an officer should do under that scenario. Just leave. You say, you think the law, not should do, but you think the law requires an officer, if they make a stop, and if people don't like the stop, and a crowd of three or four people get a little bit riotous or a little bit whatever that word is, I'm not trying to overstate it, you say the law is the officer has to just leave that potential crime scene and just walk away. He didn't stop this car, Your Honor. But I'm asking my question. Right. So under your question, if he had made a traffic stop on the truck, then no, because he would have had some legal reason to make the stop, which creates a legal relationship between him and Mr. Marshall. That didn't happen in this case. This was not a traffic stop. But of the fact he was investigating a shooting in the area, and that he didn't know who the shooter was, and this was an exigent circumstance to find out who had committed the shooting. And here they have somebody who is being belligerent in that context. Does that matter in answering Judge Shedd's question about what they were legally required to do? Did they just walk away when he might have been the shooter? I mean, they didn't know, and he wasn't cooperating. He was telling them to bug off. Right. And the phone call that comes in doesn't give them information that this truck was involved in the shooting. No. They're looking for a shooter. And I ask him, do you have reasonable suspicion that Mr. Marshall may have been the shooter? I do not. And then I ask him, so he goes to Mr. Marshall and Florida v. Royer says he can ask him, who are you? What are you doing? Kind of general questions. But the same case says Mr. Marshall can say, not interested. But what this officer does is comes up and says, I want to search the truck. Let me search the truck. And he says, no. Leave me alone. And then the language gets bad. This is BS. Quit effing with me. He's mad. So in answer to Judge Shedd's question, you're saying he was legally required to leave. Leave is the wrong word. He was legally required to go no further. That's what you said. Then let me modify the answer. I think he might want to. Well, I think, I guess I can't. He's on a public roadway. Let's leave. What should he have done? De-escalate by the officer just stopping what he was doing and walking away from it. That's your answer. And if he doesn't have a legal relationship with Mr. Marshall that allows him to continue with some type of investigation, questioning. The officer can ask him any questions he wants to, can't he? And Mr. Marshall can say, I don't want to answer those? I didn't say that. Right. Yes. I didn't ask you that. Yes. The officer can ask anybody anything they want to. You don't have to answer. But once he stops answering, then the officer, this Court has said, that once he says, no, I'm not going to answer, he doesn't get to prolong that stop, that situation, that relationship without something else. So when I asked him over and over again, what was your answer? It was something else, not the concern about shooting and gunplay in the neighborhood. Because that's not what the call said. The call didn't say this car was involved in it. I didn't say that. You keep adding stuff that you want to to my question. Isn't there a call that there was a shooting, I can't remember the exact facts, but guns and it was a concern that somebody had guns that were going to go after the shooter or something like that. Yes. And the police know that neighborhood generally, right? They indicate it. That's what he said. Yes. Right. And so he goes there. They're trying to figure out what's going on. And your answer is, if one person there doesn't want to answer a question, they have to stop the investigation of what could lead to some information. And in fact, not that it matters, but did lead to some information about illegal activity. But your view is, legally, you just have to walk away from it. Your Honor, it's not my view. It's the law's view. The law says you don't get to keep it down. Well, let me say this. I think we'll decide what the law says. Right. But I'll tell you that it says that when he stops answering those questions, the police don't get to just keep doing whatever they want to do, and it didn't uncover what he  It didn't say that. There's no law that says one time, in any setting, you ask one question and a person refused. You have to stop asking questions and walk away. That's not the law. Then, Your Honor, so if the… That's not the law. Under Flaherty v. Royer, the law is that if he asks the question and the person being questioned refuses to answer or cooperate, neither person has done anything wrong. So what is the next step? Okay. I'm sorry. Go ahead. Well, I wonder what the next step is. If the questions have been asked and the person says, I don't want to answer your questions, then maybe you can continue investigating, but then can you arrest that person for in fact protesting what the law says you are supposed to do? Well, to back it up a little bit, though, the police did have information that there was a dark pickup truck involved in the shooting. And didn't the evidence show or the records show that this gentleman was driving a dark pickup truck? It did. It generally matched the description? Doesn't that also… Isn't that an important factor? If he was… There was recently a shooting in the area. There was a dark pickup truck with rims. This guy's driving a dark pickup truck and he's pushing back on the officer's attempt to ask him some questions. Doesn't that create a problem in terms of your position? And I know… No. And I know I may be frustrating because I'm sticking to this precise language, but if the court says that my client can do that and the officer, where do we go from there? In other words, the officer can't search the truck. He agrees with that. I don't think there's any grounds under which he gets to search the truck. So all he can do is question my client. Now my client is allowed to not answer him and he's allowed to push back like we said. So what is step two of that? I think maybe he gets to keep asking questions, but at some point there becomes a probable cause issue because he's prolonging this sort of interaction with no real reason to do it. So the problem that I have with what happened here is that we don't ever move the legal relationship past this questioning and that's what he arrests Mr. Marshall for. As a matter of fact, counsel, when you concede that if his truck was red, he could have walked up to him and asked him a question, couldn't he? He could have walked up to him and asked him a question if he had nothing to do with the pickup truck and that's what Flaherty v. Royce says. If he was driving a motor scooter, he could have walked up to him and said, you know, I think I heard there was a shooting here. You know anything about it? And right, so that has nothing to do, really, does it? And that's my point. So the issue is that he's absolutely allowed to talk to him, but my guy can say, I don't want to talk to you, and when the officer pushes it, my guy can protest. He can use bad language. He can direct language that creates agitation, unrest, and annoyance, and the Supreme Court is going to stand behind my client. As a matter of fact, the expert made it clear that he wasn't equiposed by whether you want to talk to him or not. Words of protest, and there was no doubt that he wanted that encounter to end, and the police officer didn't. The Supreme Court lets him do that, and that's why I keep going back to sort of the specific, precise nature of what was going on. You focused on the question of probable cause. You haven't talked about taking the truck from the scene. You have some time left later, but you think your strongest argument in this case is the probable cause argument? I think that, Your Honor, they are equally strong. I do think they are equally strong, and what I can do is address the caretaking issue on rebuttal. I think I have time reserved. I just wanted to let the government have some idea. You know we can't get up and raise a new argument. Right, and I apologize for that. I can talk now or stop now, whatever you... Just let me finish for a second. I'm just trying to figure it out so he'll know if he should address it, too. Yes, I think he should, Your Honor. Thank you. Mr. Lewis? May it please the court. Will Lewis on behalf of the United States, and I'll address the probable cause question first. This court had a lot of questions about does this matter? Does this fact matter? Why don't you just address it? Okay. When we're addressing the probable cause, we look at the totality of the circumstances, and this starts at the call. There's a call that shots are fired in this area and that this truck or truck fitting this description is involved in it. So right then and there, Officer Haywood, responding to this call, has reason to believe that there's shots fired, so somebody has a gun, and that this truck was involved in it. He then follows the car that pulls into a private driveway. He gets out to confront the driver, Mr. Marshall. Is that reasonable suspicion? Have you argued that? Do you think that is reasonable suspicion? He has reasonable suspicion right there that shots are fired or shots have been fired. As to this person? As to this truck that the driver got out of. But regardless, the defendant's already conceded that he can approach and ask those questions. And then after that, in response to these questions, the defense has conceded that he can be there. By Judge Anderson's finding, the defendant becomes loud, boisterous, and begins cussing at him. At the same time... What's wrong with that? There's nothing wrong with that if it was alone. But you can't take somebody's speech out of the context of where they make it. For example... They make it on a private property where there are people who were not gathered because of this incident, but they were already there, gathered before the police got there, correct? So you can't say this is a crowd that was created by the incident at all, correct? Correct. Which would be the same thing if you went to someone's barbecue in their yard in a suburban neighborhood and they had a party. And you come, there would be people standing around. Is that a crowd? Is that a crowd? That's 10 to 15 people. We can call it a crowd, but I'll just... If it's a suburban area and a barbecue, that's a crowd, right? Correct. So it's already there, and you walk up to someone who you have a right to speak to and say, listen, I'm saying something to you for a name, and you say, can I search your car? No. And then he says, fuck you, no, you can't search. No. That's what he said. No. This is bullshit. He's trying to mess with me. What's wrong with that? It's America. He's on private property, and he's saying, I told you, no, you can't search my vehicle, and now you're still bothering me. So he says in a very cruel, not condoning it, but that's an expletive, and it's an idiom, really, and it's almost like saying, forget you. If he had said, forget you, would that be wrong? It's not wrong by itself, but if we look at what this ordinance punishes, if this ordinance punishes protected speech, what you're talking about right now, then the appropriate remedy is to challenge the constitutionality. That's not the question right here. We're looking at whether there was probable cause to violate this ordinance, and this here in the record. That's not obscene. To say, fuck you, is obscene? The definition of obscene and lewd, are you sure about that? Well, at least the officer would have reason to believe that it is. We have a probable cause that it's going to meet an obscene epithet that tends to promote violence. What is the definition of obscene? We have definition legally obscene and lewd, and South Carolina has defined it, and you think that's under the definition of the South Carolina law that saying that word itself is obscene and or lewd? Not alone, but when Officer Haywood's testimony is that the crowd was feeding off of Mr. Marshall, become increasingly hostile and agitated, these are Judge Anderson's... What do you mean hostile? In this record, what is the evidence of what the crowd said? What is it? Judge Anderson found the crowd was... No, no. I don't want to know what Judge... Please just say district court. Sorry. Okay. We know the district court. Okay. District court. District court. The district court found... What was the fact? What did they say? That the crowd was hostile and agitated and cursing at the officers. Cursing at the officers? Yes. What did they say? They... It was a... What did they... ...finding by the district court. You keep saying the finding. What is the record that someone testified what they said? Finding is based on evidence. What is the evidence of what the crowd said? Go ahead. It's in the record.  The testimony of Officer Haywood saying that the crowd was hostile, belligerent, about to pop off in a riot. Exactly. They were conclusionary and they never specifically said anything they said to make conclusion. What does hostile mean? Hostile mean they were frowning? Hostile means that the... It was threatening. If you look at the other facts... Well, a lot of people are threatened just by the way people look. If we look at the facts... Let's take the officer out of... Is that okay if he was threatened by the way they look? No. That's not okay. You sure? If he says, you know, they're all African-Americans, for example, I was threatened, is that enough? No, sir. Why not? It's actions by them. And we're looking at the facts here. These are the actions. Okay. They were African-Americans. They were frowning at me. Is that okay? No. Well, what is it? A hostile, agitated crowd responding to an individual who's arrested. What is a hostile crowd? It's what the officer saw. I can only go on the testimony in the record. He didn't say what he saw. He just made a conclusion. If that's the case, any officer could say, you know, I felt threatened. They were hostile. Well, what does that mean? Well, then the... What are the facts? I mean, that's the point. So, we're here talking about constitutional law in terms of protecting people in terms of their rights. The founders put this in place, not us. So, if all it takes is someone to say, I felt threatened, something was going to pop off, what was going to pop off? Why was it going to pop off? What was done that would suggest that so that that conclusion might be based upon some facts? I guess the record is not clear, right? It is if you take Officer Haywood's testimony to the crowd. It was hostile, agitated, aggressive, and about to pop off. That's your answer, right? What is lewd or obscene about what the defendant said? The cuss words. We're relying strictly on the cuss words that he was saying. What's lewd about that? I mean, it's an act of... It's obnoxious. It's rude. It's crude. It's a lot of things. But what makes it lewd or obscene within common knowledge? I mean, I think if I was to... It wasn't asking the officer to perform a sexual act. That's clear, right? I mean, I agree with you there. What was lewd or obscene? It's a funny statute because usually these disorderly conduct statutes, at least that I've seen, have more than just lewd or obscene. It's pretty narrowly circumscribed, and I'm just wondering how these words fit that statute. They are obscene words in that if I were to use them, although it's been used today, I believe that people would be taken aback by those words. I mean, they are cursory. Does that make them lewd or obscene, though? I believe it's a fluid definition. And to the extent that this ordinance... Antisocial, certainly. I agree with you. Certainly, Judge. And to the extent that this statute punishes something that's protected speech, that's not our analysis here. That would be if this statute was challenged as to its... or this ordinance as to its constitutionality. All the cases on which the defendant relies are cases in which a court has declared the ordinance facially unconstitutional. But let me ask you, though. You have to prove the elements of your crime in order to establish probable cause to arrest. So what is the evidence of lewd or obscene epithets in this case? And do you agree that if there were no lewd or obscene epithets, you would lose? I would agree that we would lose. Are you sure you would agree with that now? You've already argued that the officer had reason to believe. That was going to be my follow-up. But that's not what she just asked you. They don't have to prove it. They just have to have reasonable facts that a reasonable officer would believe that the statute was probably violated. And that these words... To prove the case, that's all you need? For the arrest, for probable cause. For the arrest to be valid, all we need is probable cause that there are obscene epithets and that they tend to promote... Judge, I thought Judge Keenan's question was that what is the basis of probable cause that an element are met? The curse words and the hostile... And that they're lewd and obscene? Yes, Your Honor. That they're probably... We only need probable cause to establish it. Not that we've proved that element beyond a reasonable doubt. We're talking about probable cause... You can say they're lewd or probable cause that they're obscene. Both. How are they lewd? People would be offended by those words. Wait a minute. If, for example, people are offended if he says, forget you, right? Yes, Your Honor. Wouldn't they? They'd say, you know, you shouldn't talk to a police officer like that. They're doing their job. That's offensive. So it can't be because people are offended. Our rights would mean nothing in this country if it stopped that someone is offended by it. No, it's totality of the circumstances, Your Honor. But the totality is that an American citizen is asked a question without any basis of the criminal activity, can I search your vehicle? The answer is, two, no. And the second answer is, no is the second word. You get my point. But he makes it very clear to them, no. And he punctuates it with an expletive. An expletive, if you watch television these days or whatever, you hear it often. And people say it often. Suppose, for example, suppose he had said, screw you. Would that be lewd or obscene? I don't believe so. Why not? It's the same word. I do believe it's hard to take. Is a screw used also in a sexual connotation of an active copulation? Correct? Correct. And isn't it also an expletive? It can be, yes, Your Honor. Can be, right? You'd be offended if someone said, screw you, wouldn't you? Absolutely, Your Honor. Right? So what's the difference? It would be the same result. It's lewd and obscene, right? You can't take these words out of the context in which they're said. I'm putting them in the context where they are. A police officer saying, I want to search your car, I don't want you, and I think you're really just bothering me for a reason that I don't know. And this country is facing this right now, and it's a powder keg. And that is, I've told you, I don't want you to search my car. You're still badgering me. So I'm using the defense. I mean, maybe if it was a person who went to Oxford University, maybe they'd say, would you please stop impeding my way? But no, he speaks in the lexicon of the word. No, F you. So is that the difference? Does it really lie there in terms of constitutional exercise? No, and if we're asking about constitutional exercise, then we're outside of the scope of this analysis. Are we outside the Fourth Amendment? No, we're not outside of the Fourth Amendment. We're looking at whether this statute is unconstitutional, this ordinance is unconstitutional. We're looking at whether the officer who knows this ordinance has reason to believe that it's probably violated. And he hears curse words in responding to a shots fired scene. You can't take those facts outside of the circumstance. And I'll go back to Judge Shedd's question, is what were the officers supposed to do? It seems to me that they have three options. The first one is, I respond to a shots fired scene with a car that matches the description. A shot fired scene, first of all, there's no shot fired scene. A shot fired scene would suggest there was an address and a locale. It's an anonymous phone call that says shots were fired. I didn't even know whether it came from that vehicle, whether they were the victims or the perpetrator. So you're stretching it in terms, I know not deliberately, but there's not a shot fired scene that's different. So he comes, as a matter of fact, he finds nothing that's consistent with somebody being scattered or afraid or fleeing from or fleeing to a shot fired scene, is there? He does find the car that was described as involved in the shots fired. A dark car. That's really a rare car to find. A dark car, that's real rare. You have caller number two, who describes that the police had just pulled up and the driver got out of the car that was involved in the scene. Caller number two states that. So that's further evidence that this car was involved. And so we have a shots fired car, a call, and a car matching that it was involved in. That's fine. Okay, so what is he supposed to do? You asked the question, right? Well. Maybe he could continue to question him. Yeah, he questions him. And then the scene becomes, we'll just take it, about to riot. He's combative, the crowd is cussing at him. And what are they supposed to do? They can, one, leave. That's not true that he's combative. He's being, Judge Anderson found, or excuse me, the district court, belligerent, cursing, and there was a, as described by the crowd, they didn't want him there. We have a confrontational scene. There's no evidence in this record that he was belligerent. You know what belligerent means? Very angry. It comes from the saying where we use war. I'm using the words that the district court found in its factual findings. I know, but it has to be, we're a court of review. We don't have to accept conclusions. We look at the facts in the record that would support those conclusions. And there's nothing to conclude that he was combative. Well, let's just take it that he's cussing. Do you agree with that? What is the evidence that he was combative? He was cursing at the officers. That's not combative. Do you know what the word combat means? To fight. Right. And you can see there are no fighting words. You can't stretch this to something that it is not, to the point of non-recognition, by making these conclusions like hostile, pop off, because then the Constitution means nothing. We sit as a court of law, not as police officers. Agreed, Your Honor, and I'm using those words because those were the findings below and the words of the witnesses. We test them based on the record. Officer Haywood's testimony is in the record and it describes it as that. But again, let's just take the combative. First of all, the word combative, it has a number of uses. We don't sit to define how the word can be used. Have you ever heard somebody say, a teacher say, I was talking to that student and the student, gosh, didn't want to answer my question and got kind of combative with me. Does anybody in America think that the teacher necessarily means the student stood up and punched her? Just combative, if you look it up in the dictionary, I guarantee you it will fit the mold in some uses of not pleasant, confrontational. On the testimony in this record, the officer testified as to what he felt and what he thought, correct? Correct. Was he cross-examined on that? Correct, he was. Were other witnesses brought in to say he is absolutely not telling the truth? There weren't witnesses that brought in to say that. Well, could there have been? Could have been, yes. And so a judge makes a finding and you're stating the record from what you think the record will support. Somebody else could say it supports something else. Correct. But you just say based on that and what the officer said, you think there's a basis in this record to believe that it was both potentially problematic, whatever the word is, and that this guy was being combative. I think a lot of people would be shocked to think that when somebody is using language in response to another person, that it would be a legal ruling. By ruling, that's not combative. Do you agree with me? Yes. And you think what the point you want to make, I think you've been trying to make, is the judge heard this testimony and the judge made these findings based on that. Might another judge have made another finding? They might have. But you're glad the judge made these findings because you think not only that the record supports it, and I believe it does, and you think it's the appropriate factual findings for the circumstance, correct? Correct, Your Honor. Go ahead with your argument. Proceeding, since I've only got a few more minutes left, on to the toe. Okay, but before you do, let me ask you on the statute itself, because I think we've really got to look at the statute in order to determine the probable cause. And the statute requires linkage. It requires linkage. The defendant has to know or have reasonable grounds to know that the defendant's conduct will be promoting or tend to promote a fight, assault, or brawl. And so what does his statements of epithet to the officer, how does that stand as evidence that he knew or had reasonable grounds to know that speaking those words would tend to provoke a fight or brawl? Again, going back to Officer Haywood's testimony, when he's making these words and there's a finding that it was loud enough. It's kind of contingent on the crowd. And in other words, the crowd is the linchpin of your case, isn't it? Absolutely. If you didn't have the crowd, you wouldn't have a case, would you? No. In fact, the ordinance requires other people. I mean, if we're going to incite violence of other people, I need other people there. Let me ask you a question on the community caretaker. The sister of the defendant is identified in the record as the owner of the car. Does the record show where she lived? She did not live at that residence. Right. But does it show whether she lived a block away or two blocks away? I don't know the answer to that question. I know that the officers ran it through NCIC. They first checked to see whether Mr. Marshall was the owner of the vehicle, confirmed that he wasn't, and they confirmed the vehicle was not registered to that. And pursuant to this Columbia Police Department policy, towed the vehicle because they were responsible for that vehicle after making the arrest. And that's what the community caretaking exception or when it applies. I would quickly note. They were responsible for the vehicle. The vehicle was on private property. This was not a vehicular stop. Well, Your Honor, this officer makes an arrest where, again. You agree this was not a vehicular stop? Do you agree with that? I agree with that, yes, Your Honor. All right. So he's just a person. He's a pedestrian, and he's on private property. Correct. A friend's home. The friend has lived there for 15 years. He's known him for years. Now, the police are obligated, you said, and they're responsible for on private property at his friend's house, which he had already relinquished the keys to the friend. How in the world did the police become responsible for that? I can't leave my car at a friend's house? You can absolutely leave your car at a friend's house. But when police are responding to this volatile scene and you've got somebody who throws keys into a crowd in a car that was involved in a shooting, the police officer is supposed to leave it there. When they won, register it. Why was the car involved in the shooting? I thought it was only because. Oh, so it wasn't investigated. That's why you took it. Sir? You agreed, and you took it up for an investigation. You just said that. No, no. It's for community caretaking because the car could have a firearm in it. That's the only thing that I was the next. We don't. But there's no one there who's responsible for the car. The keys could be anywhere in this crowd. Someone could steal the car. The key to that question was could you leave your car? Well, this wasn't his car. No. He's not responsible. The question then would be can you leave a car at a friend's house? Can you? You could. Was he the custodian? Whether he owned it or not, is there anything in the record that he didn't have authority to have the car? He was not the owner of the car. No, no. Was there anything in the record that he didn't have authority to operate, possess the car? He did. He was driving it. And, therefore, he could have left it where he wanted. But after they make the arrest pursuant to this policy, there's no responsible party for them to turn it over. What connects the car to the arrest under the policy? It seems to me you're bringing in now this whole firearm thing. He's only being arrested because, as your words, he's combating and using this language. That has nothing to do with the car. The charge has nothing to do with the car. You bringing in the car for that? Well, the car comes in because an arrest is made, and this policy says when an arrest is made and there is no responsible party to take a vehicle. That's when the vehicle is connected to the arrest. The vehicle has nothing to do with the arrest. The arrest is solely because he was violating an ordinance of disorderly conduct. And he didn't say one word from the car. He said it's standing on private property. So how do you connect the car even for that policy of caretaking? Well, I'd connect it because the police are responsible for it. Let's just take that Mr. Marshall's sister is the owner of the vehicle, and he throws that key in the crowd. Is that because they saw him get out of the truck? If they had not seen him get out of the truck, could they have taken the truck? Yes. If they had not seen him get out of the truck, could they have taken it? I don't believe so. I don't believe so because they have to make an arrest that somehow brings the vehicle into their responsibility. And the basis here was they arrested the person who got out of the truck who didn't own it. That's correct. They didn't know anybody on the scene who did have possessory right in the truck. And so they have what options? To leave it there after taking him away, and by the way, and the keys are somebody there can pick up the keys and drive that truck off. Think if somebody had driven that truck off and had an accident or killed somebody, do you think the Columbia Police Department would be sued? Absolutely, Your Honor. Oh, my goodness. They would be sued because they left a car that had nothing to do with their arrest on private property? Okay. Wouldn't they if the policy was? Is it hard to imagine that lawsuit? You have a policy, don't you, City of Columbia, that if you arrest somebody you don't leave the vehicle, you tow it, but you violated that policy? Yes, Your Honor. I don't think that's for offense. The policy says so the person owns the vehicle? Responsible party. If there's no responsible party after an arrest is made. But doesn't this presuppose that the vehicle is connected with the stop and the arrest? The arrest is connected to the vehicle because the driver was arrested. But that would be true, for example, if he was in the house, the car was parked in the yard and you called for disorderly conduct, for example, and you found at the party he was intoxicated, something causing a problem, and you arrest him, you then would say, Wait, sir, what car were you driving here when you came to the party four hours ago? I was driving the one that was right there. So then you're responsible for that car then? I don't believe so. I think that's a bit more attenuated than the situation that we have here, Your Honor. It had nothing to do with it. The policy can't be every time you arrest someone who has a car and possesses one, you're now the caretaker of it, even though it's on private property and not connected at all with the arrest. It was obviously pretextual. I don't agree with that. And even if it was, it's irrelevant to the court's determination for the subjective intentions of the officers. Okay, that's the only question I have. Do I have any further questions? I don't. Thank you so much. I don't have any. Mr. Kendrick, I've got a question for you for starting off. You know, there's a tendency of us here in the appellate world to parse things really carefully, and we should be, but we're talking about probable cause here. Is an officer charged with knowing the refinements of the meanings of the statutory words? In other words, what actually constitutes lewd or obscene behavior, and do these words as a matter of law measure up? Are we putting too much of a burden on the officer that the law really doesn't require? That's something I'm grappling with right now, because I think I tend to agree with you that there's a problem fitting these words. You know, if I were making a decision beyond a reasonable doubt, was this guy guilty of disorderly conduct, you know, there's a good question as to whether he is or not. I'd be inclined to say right now sitting here, no, because the words may not match the statute. But in terms of making a probable cause determination, isn't that something a lot lesser of a burden, and are you suggesting too great a burden on the officer? No, Your Honor, we're not suggesting too great of a burden, because what you've got here is very old and very traditional sense of protected speech. I mean, we're talking about cases from nearly a century ago that say that a well-trained police officer has to show a greater degree of restraint when words, speech, communication is directed at him, and then we have the old Supreme Court case law that says, and there's a reason why the district court findings in the testimony and the record use very specific words, not because I'm a genius, but because I read these cases. And if speech loses protection, if it's likely to produce this clear and present danger of serious substantive evil that rises far above public inconvenience, annoyance, and unrest. But in the First Amendment, are you arguing against the constitutionality of this statute, or that there's no probable cause under the wording of the statute? You might have a claim for constitutionality and a problem with the statute, maybe. Which are you arguing to us? Your Honor, I think that which of the two is it? I haven't properly raised the constitutionality of the statute on its face. So the answer to your question is that I'm arguing the probable cause. Is it reasonable for a... Then isn't it correct that if you want to talk about First Amendment cases, doesn't context always matter? When and where you say the word, doesn't that matter? It does. You know, no fire in a crowded theater. Which, Your Honor, and I disagree that the no fire in a crowded theater answers any question about the First Amendment. Well, I don't know who you're disagreeing with. I just asked you. Fire in the crowded theater makes that point, doesn't it? Context matters. Well, right. But that statement... And so, do you think there's a difference in scenario, just listen to my hypothetical, when there is a crowd gathered that is hostile and is feeding off the comments that you say that are being made versus when it's just a scenario, there's nobody else there but the officer and the guy saying the same words. Do you think that makes a difference under this statute? No. And I think the statute... And I can't answer your question without at least talking about what we're talking about, which is that this crowd is 10 to 15 yards away, and they don't do anything more than parrot what Mr. Marshall is doing, and that's not enough. And the police officer... That's not enough for what, a fact finder? For the officer? I don't think the officer has probable cause to look 15 yards away at a crowd... So you say then, again, that as a matter of law, the officer cannot feel that crowd is hostile and is being incited under these circumstances. Not on this record. Just as a matter of law, you have to win. As a matter of law, on this record, he did not have probable cause that he was in any type of danger, that there was some serious substantive evil directed towards him, and I asked him over and over again, and he didn't have an answer because he didn't have evidence. And you think in this case, you think that he is just a pretextual stop? You think it's that he just doesn't like the guy, or he's not qualified or scared? How do you explain his testimony? That leads me right into community caretaking. It is absolutely pretextual, and that does matter under the community caretaking. So you think the point... Your theory of the case is the officers, he really was making this up. There's no factual basis for him to do it because he wanted to get that truck and search that truck. The first thing he said, it was the middle thing he said, it was the last thing he said, and then it's what he did. He wanted to search that truck. Under community caretaking, it is not actually a probable cause Fourth Amendment Wren objective fact analysis. And the Court has been very clear on that, that when you are talking about a community caretaking function, the programmatic policy, the standardized criteria, the same decision made each time without any hint of bad faith or the sole purpose of the tow being for investigative purposes allows you to tow a car almost carte blanche. But in this case, there is clear evidence. He keeps saying, let me search this car. Let me search this car. And the client says, you're not searching the car. And then we look at how the search actually develops. They put it on the tow truck. And he says, well, I couldn't run the canine dog around it because the crowd, the scene was unstable. He also couldn't run it around it because the Supreme Court in Florida v. Jardim says you don't get to go on private property with your trained police dog. He takes the truck to the metro headquarters, which is about a mile away, so they can secure the truck. And lo and behold, the dog happens to be there. The tow yard is down the street. The tow yard is down the street. I asked him who decided to go to the police station. I don't know. Wasn't my call. Well, you don't let the tow truck run the show. They wanted to search this car. They did search this car. Interestingly, they didn't inventory search it, which if this programmatic policy behind towing would lead to that, that never happened. And you want to put your spin on the facts, but couldn't somebody looking at these facts believe they towed the car away? And that corroborates what the officer said about what happened at the scene. He didn't want to escalate anything. He didn't want to search it there. He took it someplace or tightened it down. He took it someplace else. I know. Did you make that argument to Joe Anderson, Judge Anderson? About the car? It was all pretext, and they were just trying. Absolutely. We argued over it. He thought there were facts. He found differently than that, didn't he? What you just said is that he didn't want to search the car on the scene, which he agrees he couldn't do. Drop that off. Okay. Because I remember the record was, he said, we were concerned about doing anything more. And I think there's evidence in the record, you correct me if I'm wrong, to believe that the car was not strapped down well enough and there was a need to check the straps to double strap it. Isn't there evidence in the record of that? But when the car goes on the truck. Is there evidence of that in the record? That's what the officer said. That would be evidence in the record, wouldn't it? Yes. The answer is yes. But when the car gets put on the tow truck, and what we just talked about was he put it on the tow truck because he wanted to search it, and that doesn't meet the law. He doesn't get to do that. So the private property is almost, I mean, there's got a lot of good points to it, but the real heart of the issue is, is there evidence in the record? Does it look like he was doing it for the sole purpose of investigation? The answer to that question is absolutely yes. I'm out of time, so I appreciate the court listening. If there's no more questions. And the purpose of caretaking, it should be for investigative purposes. Is that correct? It's why the higher courts allow them to do things without a Fourth Amendment traditional probable cause analysis because it has a different purpose. If the purpose changes, so does the nature of the search. Thank you, Your Honor. Thank you, counsel. We'll come down to Greek counsel and proceed to our next case.
judges: Roger L. Gregory, Dennis W. Shedd, Barbara Milano Keenan